**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JOHN P. CHAPMAN, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Case No. 23-cv-3200 |
| | ) |
| OFFICER DECKER, et al., | ) |
| | ) |
| *Defendant.* | ) |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants, Officer Decker, Lieutenant Richert (incorrectly referred to as Rickert), Lieutenant Haring, Lieutenant Sellers (incorrectly referred to as Cellers), Sergeant Dawdy, and Lieutenant Foster (collectively referred to as "Defendants"), by and through their undersigned counsel, and pursuant to Local Rule 7.1(c), submit their combined Motion and Memorandum of Law in Support of their Federal Rules of Civil Procedure Rule 56 Motion for Summary Judgment. In support of Defendants' Motion, Defendants state as follows:

## I.  INTRODUCTION

This case arises from Plaintiff's allegations that Defendants violated his constitutional rights under 42 U.S.C. § 1983, specifically claiming excessive force, failure to intervene, and deliberate indifference in violation of the Eighth and Fourteenth Amendments. On September 26, 2023, Plaintiff filed a three (3) count Complaint against Defendants Decker, Richert, Sellers, Dawdy, Foster, Haring, and Caldwell. [Doc. 1]

On October 10, 2023, District Judge Gilbert reviewed Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A and issued a Memorandum and Order. [Doc. 10] In his Order, Judge Gilbert divided Plaintiff's claims into the following Counts:

1

- **COUNT I**: Eighth or Fourteenth Amendment claim against Defendants Decker, Richert, and Sellers for allegedly using excessive force on February 9, 2022, and March 3, 2022.

- **COUNT II**: Eighth or Fourteenth Amendment claim against Defendants Dawdy and Foster for allegedly failing to intervene in the use of excessive force on February 9, 2022.

- **COUNT III**: Eighth or Fourteenth Amendment claim against Defendant Haring for alleged deliberate indifference in placing Plaintiff in a cell without medical care after the use of excessive force on February 9, 2022. [Doc. 10]

In his Order, Judge Gilbert further noted that Plaintiff did not state a claim against Defendant Caldwell, leading to the dismissal of Defendant Caldwell from this matter. [Doc. 10]

On January 24, 2024, Defendants Lt. Sellers, Officer Decker, Sergeant Dawdy, Lt. Foster, Lt. Haring, and Lt. Rickert filed an Answer to Plaintiff's Complaint [Doc. 32].

## II.    STATEMENT OF MATERIAL FACTS

1.    Plaintiff underwent brain surgery in 2016 after sustaining a gunshot wound to the head. [Ex. 1, p. 38, Deposition of Plaintiff, John Chapman]

2.    Following the surgery, Plaintiff began experiencing seizures, was diagnosed with epilepsy, and prescribed seizure medication. [Ex.1, p. 41; Ex. 2, Plaintiff's Booking Card and Questionnaire]

3.    Plaintiff believes "if it [seizure] is one I can control it, it is not that bad." [Ex.1, p. 55]

4.    Before entering Madison County Jail, Plaintiff was housed in the St. Louis County infirmary, where he also experienced seizures. [Ex. 1, p. 44]

5.      Plaintiff was booked in Madison County Jail on or around January 26, 2022. [Ex. 2]

6.      On February 4, 2022, while in court for a hearing, Plaintiff experienced a seizure. [Ex. 1, pp. 11, 45]

7.      As of February 9, 2022, Plaintiff had been off methamphetamine for 18 to 20 days, and was experiencing withdrawal symptoms. [Ex. 1, p. 25; Ex. 2]

8.      On the morning of February 9, 2022, on or around 9:30am-10:00am, Plaintiff could not locate his jail-issued tablet and was told the tablets had been placed on the block. [Ex. 1, p. 13].

9.      That same day, at approximately 11:10 a.m., while conducting a routine security check in G-South, Defendant Decker was informed that Plaintiff was yelling at another detainee and attempting to provoke a fight. [Ex. 3, February 9, 2025 Officer Activity Log; Ex. 4, February 9, 2022 Incident Report; Ex 5, Affidavit of Officer Decker]

10.     Officer Decker observed Plaintiff, who was not wearing a shirt, approach the other detainee and yell, "Let's go right now bitch.  Fucking fight me." [Ex. 4; Ex. 5]

11.     The other inmate reported being in fear for his life due to Plaintiff. [Ex. 1, pp. 13, 16]

12.     Officer Decker directed Plaintiff to return to his cell for lockdown, but Plaintiff refused this directive and stated, "Make me."  [Ex. 4; Ex. 5]

13.     Jail Officer Decker radioed for assistance, stating that Plaintiff had been fighting with another detainee and was refusing to return to his cell. [Ex. 4; Ex. 5]

14.    Lieutenant Richert, Lieutenant Haring and Sergeant Dawdy immediately responded. [Ex. 4; 6, Affidavit of Lieutenant Richert; Ex. 7, Affidavit of Lieutenant Haring; Ex. 8, Affidavit of Sergeant Dawdy]

15.    Following Jail Officer Decker's request for assistance, Plaintiff returned to his cell [Ex. 4; Ex. 5]

16.    Jail Officer Decker and Lieutenant Richert then went to Plaintiff's cell and directed him to exit his cell to be moved to Segregation Unit 1 due to fighting with another detainee [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

17.    Plaintiff refused Jail Officer Decker and Lieutenant Richert's directives to comply multiple times. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

18.    Lieutenant Richert then gripped Plaintiff's right arm and Jail Officer Decker directed Plaintiff to exit his cell, at which point Plaintiff complied. [Ex. 4; Ex. 5; Ex. 6]

19.    In the main jail hallway from cellblock G-South, Jail Officer Decker handed Plaintiff his uniform shirt and instructed him to put it on, to which Plaintiff responded, "Fucking make me," clenched his fists, and turned aggressively toward Decker, displaying combative behavior. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9, February 9, 2022 Jail Footage]

20.    Plaintiff was directed to get on the floor but instead, using his body weight, intentionally dropped to the floor.  [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9]

21.    Officer Decker secured Plaintiff's right arm behind his back, Lieutenant Richert secured Plaintiff's left arm behind his back, and Lieutenant Haring secured Plaintiff's legs. [Ex. 1, p. 25; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9]

22.    Plaintiff yelled threats at the officers and continued resisting, shouting he would "kick all of our asses" and that "we were all fucking pussies." [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

23.     As Lieutenant Haring attempted to handcuff Plaintiff's left wrist, because Plaintiff became more aggressive, Lieutenant Haring applied pressure to Plaintiff's upper left thigh to gain compliance and secure the handcuff. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9]

24.     Plaintiff resisted again as officers attempted to secure his right wrist and spat at Officer Decker. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

25.     After verbal commands, Plaintiff eventually complied. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

26.     Jail Officer Decker and Sergeant Dawdy placed Plaintiff in a standing position and escorted him down the main hallway towards Segregation Unit 1. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9]

27.     Plaintiff complied with the order to kneel down but refused to lie down so that the handcuffs could be removed. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

28.     Plaintiff resumed yelling and threatening the jail officers. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

29.     Lieutenant Haring secured Plaintiff's legs and Plaintiff then laid down on the floor. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

30.     Sergeant Dawdy then began removing the left wrist handcuff and told Plaintiff to place his left arm flat on the floor. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

31.     Plaintiff did not comply and attempted to push himself up from the floor and roll his body. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

32.     Jail Officer Decker placed his right hand on the back of Plaintiff's left shoulder to prevent him from pushing up/standing up from the floor.  [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

33.    Plaintiff continued his combative and aggressive behavior and refused to comply with directives to stop. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

34.    Lieutenant Haring deployed a one-second burst of OC (pepper spray) to Plaintiff's facial area. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

35.    Plaintiff then became compliant, and the remaining handcuff was removed. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

36.    Jail Officers were then able to safely exit Segregation Unit 1. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

37.    After exiting Segregation Unit 1, officers instructed Plaintiff to rinse his face with water, and nursing staff was notified of the incident. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

38.    At approximately 11:42 a.m., Plaintiff was striking his cell door and verbally threatening jail staff. [Ex. 3]

39.    At approximately 12:10 p.m., while delivering a lunch tray, Defendant Decker observed Plaintiff yelling threats, including "I'm gonna beat your ass," and spitting at the window. [Ex. 3]

40.    Plaintiff continued to beat on the door and threaten staff. [Ex. 3]

41.    While in Segregation Unit 1, Plaintiff was monitored regularly. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

42.    At approximately 5:39 p.m., Jail Officer Foster approved Plaintiff from Segregation Unit 1 to C-Pod North. [Ex. 10, Affidavit of Lieutenant Sellers]

43.    Plaintiff received Detainee Violation Notices for Refusing to Lock Down Upon Staff Order, Resisting Staff, Threatening Staff, Arguing with Staff, Causing a Disturbance, Cursing

at Staff, and Failure to Comply with a Staff Order. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 11, John Chapman February 9, 2022 Detainee Violation Notice]

44.    On February 10, 2022, Plaintiff was evaluated by Jail Medical Staff, who noted he had been in a fight with another detainee on February 9, 2022, resulting in a black right eye, and provided him with Tylenol and ice packs upon request. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 12, February 10, 2022 Narrative Progress Note]

45.    Plaintiff signed a Protective Custody Form on February 16, 2022 agreeing to 30 days of lockdown. [Ex. 1, p. 38; Ex. 13, Plaintiff's Grievances]

46.    While in lockdown, Plaintiff was provided with a mattress, clothing, showers, and one hour out of cell per day. [Ex. 1, p. 36]

47.    Plaintiff set forth allegations pertaining to March 3, 2022, but there is no report of such claims. [Ex. 1 pp.78-85; Ex. 14, March 3, 2022 Officer Activity Log]

48.    Plaintiff did not file a grievance pertaining to any alleged incident on March 3, 2022, but did submit a Mental Health Request on that date. [Ex. 13; Ex. 15, Plaintiff's March 3, 2022 Mental Health Request]

49.    Lieutenant Sellers had no involvement or interactions with Plaintiff, on either February 9, 2022, or March 3, 2022. [Ex. 3; Ex. 4; Ex. 10]

50.    No unreasonable force was used by Officer Decker, Lieutenant Sellers, Lieutenant Richert, Lieutenant Haring, or Lieutenant Foster against John P. Chapman on February 9, 2022. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 10]

51.    No force was used by Officer Decker, Lieutenant Sellers, Lieutenant Richert, Lieutenant Haring, or Lieutenant Foster against John P. Chapman on March 3, 2022. [Ex. 5; Ex. 6; Ex. 7; Ex. 10; Ex. 14]

52.     Upon his arrival at the Madison County Jail and continuing through the dates of the alleged incidents on February 9, 2022, and March 3, 2022, Plaintiff repeatedly refused medical treatment and/or medication [Ex. 16, Plaintiff's Refusal of Medicine and Treatment Forms From February 4, 2022 through March 4, 2022]

53.     Between February 10 and May 25, 2022, Plaintiff submitted multiple grievances, primarily concerning his ongoing seizure condition, which predated the February 9, 2022 incident by several years. [Ex. 1, p. 53; Ex. 13]

54.     On May 25, 2022, Plaintiff was evaluated by an outside neurologist who adjusted his medication, leading to improved management of his seizure activity. [Ex. 1, p. 56]

55.     Following the neurologist's evaluation and the resulting improvement in his condition, Plaintiff no longer felt the need to submit further grievances. [Ex. 1, p. 57]

### III.     SUMMARY JUDGMENT STANDARD

Federal Rules of Civil Procedure Rule 56 provides, as to the moving party, the court "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Parties may use "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to prove up their motion for summary judgment. FED. R. CIV. P. 56(c)(1)(A).  In determining whether there is a genuine issue of fact, the court views the evidence and all reasonable inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Tesch v. County of Greenlake,* 157 F.3d 465, 471 (7th Cir. 1998). However, "neither the mere existence of some alleged factual dispute between the parties…nor the demonstration of some metaphysical doubt as to the material facts…will sufficiently

demonstrate a genuine issue of material fact." *Forman v. Richmond Police Department,* 104 F.3d 950, 957 (7th Cir. 1997) quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

## IV.   ARGUMENT

### A.  Defendants Decker, Sellers, and Richert Are Entitled to Summary Judgment on Count I Because Any Use of Force Was Objectively Reasonable Under the Fourteenth Amendment

As a pretrial detainee, Plaintiff's excessive force claims arise under the Due Process Clause of the Fourteenth Amendment.  The controlling standard, as set forth by the Supreme Court in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), requires a plaintiff to show that the force used was objectively unreasonable from the perspective of a reasonable officer on the scene.  This standard is not governed by the officer's subjective intent or motivation, but instead asks whether the force used was excessive considering the circumstances confronting the officers at the time. *Id.*

In *Kingsley*, the Court held that "a pretrial detainee must show that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97.  The analysis must account for the legitimate need to maintain order and institutional security, especially in volatile situations involving potential threats to staff or other detainees. *Id.* at 397 (courts must defer to the judgment of officials faced with "split-second decisions in tense circumstances").

The Seventh Circuit has reaffirmed this standard, emphasizing that force is justified when it is proportionate to the threat posed and the legitimate security interests involved.  In *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010), the court held that force is not excessive when it is necessary to maintain order or ensure officer safety.  Similarly, in *Zaya v. Sood*, 836 F.3d 800 (7th Cir. 2016), the court emphasized that the reasonableness of force must be judged from the

perspective of a reasonable officer on the scene, acknowledging that officers often must make split-second decisions and that it must be grounded in the circumstances known to the officers at the time force was applied.   In assessing objective reasonableness, courts consider factors including the severity of the force used, the need for application of force, the threat the detainee posed, and efforts made to limit the force.  *Id.*  Similarly, excessive force claims must be evaluated considering all relevant circumstances, not through hindsight. *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001).

Defendants are entitled to summary judgment on Count I of Plaintiff's Complaint because there is no genuine dispute as to any material fact and, when the facts are applied to the governing legal standard, the force used by Officer Decker and Lieutenant Richert on February 9, 2022, was objectively reasonable. Lieutenant Sellers was not present during the incident and had no involvement or interaction with Plaintiff.   Under the Fourteenth Amendment, force must be evaluated from the perspective of a reasonable officer on the scene, considering the threat posed, the need for force, the severity of the force used, and efforts to limit it. Based on the undisputed facts, no constitutional violation occurred. Additionally, no incident occurred on March 3, 2022, and no records exist relating to such an event. Accordingly, Defendants Decker, Richert, and Sellers are entitled to summary judgment on Count I of Plaintiff's Complaint.

### *Plaintiff's Preexisting Medical Condition and Seizure History*

Plaintiff John P. Chapman ("Plaintiff") underwent brain surgery in 2016 after sustaining a self-inflicted gunshot wound to the head. [Ex. 1, p. 38]  Following the surgery, Plaintiff began experiencing seizures and was diagnosed with epilepsy and prescribed seizure medication. [Ex. 1, pp. 40-41] Before entering Madison County Jail, Plaintiff was housed in the St. Louis County infirmary, where he also experienced seizures. [Ex. 1, p. 44] Plaintiff was booked into Madison

County Jail on or around January 18, 2022 [Ex. 2, Plaintiff's Booking Card and Questionnaire] On February 4, 2022, while appearing in court for a hearing, Plaintiff experienced a seizure. [Ex. 1, pp. 11, 45] By February 9, 2022, Plaintiff had been off methamphetamine for 18 to 20 days. [Ex. 1, p. 25; Ex. 2]

### *February 9, 2022*

The morning of February 9, 2022, between approximately 9:30 and 10:00 a.m., Plaintiff could not locate his jail-issued tablet and was told the tablets had been placed on the block. [Ex. 1, p. 13] Later that day, at about 11:10 a.m., while conducting a routine security check in G-South, Officer Decker was informed that Plaintiff was yelling at another detainee and attempting to provoke a fight. [Ex. 3, February 9, 2025 Officer Activity Log; Ex. 4, February 9, 2022 Incident Report; Ex. 5, Affidavit of Officer Decker] Officer Decker observed Plaintiff, who was not wearing a shirt, approach the other detainee and yell, "Let's go right now bitch. Fucking fight me." [Ex. 4; Ex. 5]  The other inmate reported being in fear for his life due to Plaintiff. [Ex. 1, pp. 13, 16] Officer Decker directed Plaintiff to return to his cell for lockdown, but Plaintiff refused and said, "Make me." [Ex. 4; Ex. 5]  Officer Decker radioed for assistance, and Lieutenant Richert, Lieutenant Haring, and Sergeant Dawdy immediately responded. [Ex. 4; Ex. 6, Affidavit of Lieutenant Richert; Ex. 7, Affidavit of Lieutenant Haring; Ex. 8, Affidavit of Sergeant Dawdy] Following Officer Decker's request for assistance, Plaintiff returned to his cell. [Ex. 4; Ex. 5]  Jail Officer Decker and Lieutenant Richert then went to Plaintiff's cell and directed him to exit to be moved to Segregation Unit 1 due to fighting with another detainee. [Ex. 4; Ex. 5; Ex. 6; Ex, 7; Ex. 8]  Plaintiff refused Officer Decker and Lieutenant Richert's repeated directives to comply. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Lieutenant Richert then gripped Plaintiff's right arm and Officer Decker directed Plaintiff to exit his cell, at which point Plaintiff complied. [Ex. 4; 5; Ex. 6]

11

In the main jail hallway from cellblock G-South, Officer Decker handed Plaintiff his uniform shirt and instructed him to put it on, to which Plaintiff responded, "Fucking make me," clenched his fists, and turned aggressively toward Decker. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8, February 9, 2022 Jail Footage]  Plaintiff was directed to get on the floor but instead, using his body weight, intentionally dropped to the floor. [Ex. 4; Ex. 5; Ex. 6; Ex, 7; Ex. 8]  Plaintiff continued resisting, shouting toward the officers that he would "kick all of our asses" and that "we were all fucking pussies." [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]   Because Plaintiff was becoming more aggressive, Lieutenant Haring attempted to handcuff Plaintiff's let wrist, and had to apply pressure to Plaintiff's upper left thigh to gain compliance and secure the handcuff. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Plaintiff then spat at Officer Decker and continued to resist as officers attempted to secure his right wrist in the handcuff. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8] After a series of verbal commands, Plaintiff then complied. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8] Officer Decker and Sergeant Dawdy placed Plaintiff in a standing position and escorted him down the main hallway towards Segregation Unit 1. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Once in his cell in Segregation Unit 1, Plaintiff complied with the order to kneel down but refused to lie down so that the officers could remove his handcuffs. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Plaintiff resumed yelling and threatening the jail officers. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Lieutenant Haring secured Plaintiff's legs, at which time Plaintiff then laid down on the floor. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Sergeant Dawdy then began removing the handcuff from Plaintiff's left wrist and told him to place his left arm flat on the floor. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Plaintiff did not comply and attempted to push himself up from the floor and roll his body. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8] Officer Decker then placed his right hand on the back of Plaintiff's left shoulder to prevent Plaintiff from pushing up or standing up from the floor. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Plaintiff continued his combative

and aggressive behavior and refused to comply with directives to stop. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8] As a result of this behavior, which was threatening the safety of the officers and order of the jail, Lieutenant Haring deployed a one-second burst of OC (pepper spray) to Plaintiff's facial area. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Plaintiff then became compliant, and the remaining handcuff was removed. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  The jail officers were then able to safely exit Plaintiff's cell in Segregation Unit 1, at which time they instructed Plaintiff to rinse his face with water, and notified nursing staff of the incident. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]

At approximately 11:42 a.m., Plaintiff was striking his cell door and verbally threatening jail staff. [Ex. 3]  Approximately 30 minutes later, around 12:10 p.m., while delivering a lunch tray, Officer Decker heard Plaintiff yelling threats, including "I'm gonna beat your ass," and he further observed Plaintiff spitting at the window. [Ex. 3]  Jail staff routinely monitored Plaintiff, and observed Plaintiff beating on his cell door and threatening staff. [Ex. 3; Ex. 5]

At approximately 5:39 p.m., Plaintiff had calmed down, so Officer Foster approved Plaintiff's move from Segregation Unit 1 to C-Pod North [Ex. 10, Affidavit of Lieutenant Sellers] Plaintiff was then issued his property and allowed to shower. [Ex. 3]

On February 10, 2022, Plaintiff was evaluated by Jail Medical staff, who noted he had been in a fight with another detainee on February 9, 2022, resulting in a black right eye, and provided him with Tylenol and ice packs upon request.  [Ex. 5; Ex. 6; Ex. 7; Ex. 8] Plaintiff remained in lockdown in accordance with jail disciplinary procedures, pending further review and hearing. [Ex. 3] Plaintiff signed a form agreeing to 30 days of lockdown, where he was provided with a mattress, clothing, showers, and one hour out of his cell per day. [Ex. 1, pp. 36, 38; Ex. 13]

Plaintiff received Detainee Violation Notices for Refusing to Lock Down Upon Staff Order, Resisting Staff, Threatening Staff, Arguing with Staff, Causing a Disturbance, Cursing at

Staff, and Failure to Comply with a Staff Order. [Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 11, John Chapman February 9, 2022 Detainee Violation Notices]

The undisputed material facts demonstrate that the use of force on February 9, 2022, was reasonable, necessary, and directly responsive to Plaintiff's own combative and uncooperative conduct. The applicable legal standard under the Fourteenth Amendment requires consideration of whether the force used was objectively reasonable in light of the facts and circumstances known to the officers at the time. Here, the record shows that Plaintiff repeatedly refused lawful directives, acted aggressively toward another detainee, and created an ongoing threat to the safety and security of the facility.

At the time of the incident, Plaintiff was experiencing methamphetamine withdrawal, which likely impacted his physical and emotional state, contributing to his agitation and refusal to comply. However, this does not excuse his conduct, and it does not render the officers' response unreasonable. Officers were required to act in real time to defuse a volatile situation, ensure institutional security, and prevent harm to staff and others.

The force used was brief, limited, and proportional to Plaintiff's escalating resistance. The officers made repeated efforts to gain voluntary compliance before using any force and ceased using force once Plaintiff complied. The use of OC spray occurred only after verbal directives and physical efforts failed, and Plaintiff continued resisting in a confined space. At no point does the record reflect the use of excessive or gratuitous force.

Following the incident, Plaintiff was regularly monitored, provided meals, offered showers, and had access to medical care and medications. Throughout his time at Madison County Jail, Plaintiff consistently received his prescribed anti-seizure medication. While he now attempts to link the events of February 9 to a prior seizure condition resulting from a self-inflicted 2016

14

gunshot injury and related brain surgery, the record reflects that his seizure disorder is longstanding and not connected to the conduct of the officers on February 9. [Ex. 1, pp. 38, 40-41; Ex. 2] Plaintiff had suffered seizures on and off for years and had one in court days before the incident. [Ex. 1, pp. 38, 40-41; Ex. 2]  The officers acted based on Plaintiff's behavior and there is no evidence they were aware of or disregarded any medical need during the incident.

Importantly, there is no evidence that Lieutenant Sellers had any involvement or interactions with Plaintiff on February 9, 2022. [Ex. 3; Ex. 4; Ex. 10]  The incident reports, activity logs, and affidavits confirm that Lieutenant Sellers was not present and did not participate in the events that gave rise to Plaintiff's claim. [Ex. 3; Ex. 4; Ex. 10] As such, Lieutenant Sellers is entitled to summary judgment and dismissal from this claim.

As to Defendants Decker and Richert, the undisputed facts show that their actions were reasonable, proportionate, and in direct response to a detainee who was noncompliant, combative, and threatening institutional security.  They followed jail protocol, used only the amount of force necessary to gain control of the situation, and stopped once compliance was achieved. Their conduct satisfies the objective reasonableness standard under the Fourteenth Amendment, and there is no evidence from which a jury could conclude that the force used was excessive under the circumstances.

Because there is no genuine dispute of material fact and the force used was reasonable as a matter of law, Defendants Decker, Richert, and Sellers are entitled to summary judgment on Count I of Plaintiff's Complaint.

### March 3, 2022

Plaintiff alleges a second incident of excessive force by Defendants Decker, Sellers, and Richert on March 3, 2022, during his 30-day lockdown.  However, this allegation is entirely

15

unsubstantiated. The undisputed record contains no evidence that any force was used against Plaintiff on that date, nor that Defendants had any interaction with him. [Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 10]

The March 3, 2022, Officer Activity Log includes no entries referencing Plaintiff or any altercation. [Ex. 14, Officer Duty Log March 3, 2022]  There are no incident reports, video recordings, medical records, or other documentation supporting Plaintiff's claim.  Furthermore, Plaintiff filed no grievances or complaints related to this date through the administrative remedy process.  [Ex. 13] On March 3, 2022, all Plaintiff filed was a Mental Health Request Form, which did not set forth any allegations or evidence thereof [Ex. 15, John P. Chapman's Mental Health Request] Plaintiff did not produce any admissible evidence identifying specific conduct by these Defendants on March 3, 2022.

Because the record lacks any objective evidence that a use of force occurred, Plaintiff's allegations are uncorroborated and insufficient to create a genuine issue of material fact.  Even if Plaintiff's account is accepted as true for purposes of this motion, it fails to establish that any force was used, let alone that it was excessive or unreasonable.  Courts routinely reject excessive force claims based solely on an inmate's uncorroborated testimony, especially where no record of force exists or where any force alleged was brief and reasonable. *See Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) (recognizing that correctional officers must be permitted to use reasonable force to maintain order).  Defendants are, therefore, entitled to summary judgment as it pertains to the March 3, 2022 allegations set forth in Count I.

In sum, with respect to the February 9, 2022 incident, Defendant Sellers did not interact or any force used was reasonable and justified under the circumstances.  As to the March 3, 2022 allegation, the undisputed record shows no incident occurred involving Defendants Decker,

Sellers, or Richert.  Accordingly, Plaintiff's claims fail as a matter of law, and summary judgment in favor of Defendants on Count I is appropriate.

**B.** **Dawdy and Foster Should be Granted Summary Judgment on Count II as No Excessive Force Occurred, and, Even If It Had, They Had No Reasonable Opportunity to Intervene.**

To prevail on a failure-to-intervene claim in the context of excessive force under the Fourteenth Amendment, a plaintiff must show: (1) that excessive force was used, and (2) that the defendant officer had a realistic opportunity to intervene to prevent the harm but failed to do so. *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012).  The Seventh Circuit has applied the objective reasonableness standard from *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), to excessive force claims brought by pretrial detainees, focusing on whether the force was objectively unreasonable under the totality of the circumstances. *Abbey v. City of Chicago*, 793 F.3d 702, 705 (7th Cir. 2015).

However, as courts have repeatedly emphasized, a failure-to-intervene claim is contingent on an underlying constitutional violation.  "It logically follows that there must exist an underlying constitutional violation" to support such a claim.  *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *see also Smith v. City of Chicago*, 242 F.3d 737, 741–42 (7th Cir. 2001).  Where no excessive force occurred, there can be no liability for failing to intervene.  In addition, the Seventh Circuit has made clear that an officer cannot be held liable for failure to intervene unless they had a realistic and timely opportunity to prevent the use of excessive force. *Yang v. Hardin*, 37 F.4th 1048, 1054 (7th Cir. 2022).

Count II of Plaintiff's Complaint alleges that Defendants Dawdy and Foster failed to intervene to prevent excessive force during the February 9, 2022 incident.  However, as set forth above, the undisputed evidence establishes that the force used was objectively reasonable and

17

directly responsive to Plaintiff's combative and threatening behavior. The officers' measured response was necessary to maintain order and ensure safety within the facility. Because no excessive force occurred, Plaintiff's failure-to-intervene claim against Dawdy and Foster fails as a matter of law.

Moreover, even if excessive force had occurred, Sergeant Dawdy and Lieutenant Foster did not have a realistic opportunity to intervene.  First, Lieutenant Foster was not even present during the incident and therefore could not have intervened. [Ex. 3; Ex. 4; Ex. 10, Affidavit of Lieutenant Sellers]  The only action Foster took related to the incident was approving Plaintiff's move from Segregation Unit 1 to C-Pod North at approximately 5:39 p.m., well after the incident had concluded. [Ex. 10]  Because Foster was not on the scene during the incident, he had no realistic or timely chance to intervene, and is, therefore, entitled to summary judgment.

Next, although Sergeant Dawdy was present during the February 9, 2022 incident, there was no need for him to intervene. [Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8]  Even if intervention had been necessary, the incident unfolded quickly as a direct and reasonable response to Plaintiff's uncooperative and combative behavior, leaving Dawdy no realistic opportunity to intervene.  The situation was rapidly controlled to ensure the safety of all involved, allowing no time for intervention.   Furthermore, Plaintiff acknowledges that Dawdy handcuffed him promptly and appropriately, stating that Dawdy "put cuffs on me like he was supposed to" and "did do a good job putting cuffs on me" without causing harm. [Ex. 1] Plaintiff also confirms that Dawdy removed his handcuffs upon arrival in segregation and regularly checked on him throughout his detention. [Ex. 1] These admissions underscore Dawdy's proper and lawful conduct and confirm that no failure to intervene occurred.

18

A failure-to-intervene claim requires both an underlying constitutional violation and a realistic opportunity to intervene, neither of which exists here.  Because no constitutional violation occurred, and neither Dawdy nor Foster had a realistic chance to intervene, Count II of Plaintiff's complaint fails as a matter of law.  Summary judgment should therefore be granted in favor of Defendants Dawdy and Foster on Count II of Plaintiff's Complaint.

**C.  Defendant Haring Should Be Granted Summary Judgment on Count III as Plaintiff Cannot Show Deliberate Indifference To A Serious Medical Care Need Under The 14th Amendment.**

To prevail on a claim of deliberate indifference to medical needs under the Fourteenth Amendment, a pretrial detainee must establish two elements: (1) that they suffered from an objectively serious medical condition, and (2) that the defendants' response to that condition was objectively unreasonable. *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019); *Rice v. Kim*, 704 F. Supp. 3d 845, 853 (N.D. Ill. 2023).  A medical need is "objectively serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that even a layperson would recognize the necessity for medical attention. *Williams*, 937 F.3d at 942. The second prong requires more than negligence or even gross negligence; it requires that the defendant acted purposefully, knowingly, or recklessly in responding to the medical need, such that their conduct was objectively unreasonable in light of the circumstances. *Rice*, 704 F. Supp. 3d at 853 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)); see also *Tucker v. Randall*, 840 F. Supp. 1237, 1244 (N.D. Ill. 1993) ("Deliberate indifference means more than negligence; it requires a showing of criminal recklessness or intentional wrongdoing").

Count III of Plaintiff's Complaint asserts a Fourteenth Amendment deliberate indifference claim against Lieutenant Haring, alleging that Haring placed Plaintiff in a segregation cell on February 9, 2022, without providing medical care.  However, the record contains no evidence that

Plaintiff had a serious medical condition requiring immediate treatment at that time, nor that Haring was subjectively aware of any such urgent need and deliberately disregarded it. Although Plaintiff has a documented history of epilepsy resulting from a 2016 gunshot wound and subsequent brain surgery, his condition was managed with prescribed medication, which was made available to him. [Ex. 1, p. 62]  Despite his frequent refusals to take the medication, there was no indication that his condition presented as an emergency on February 9. [Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 12, February 10, 2022 Narrative Progress Note; Ex. 16, Plaintiff's Refusal of Medicine and Treatment File] His condition was chronic and provided ongoing prescribed treatment, not emergent, and no evidence suggests that Haring was aware of any immediate medical need, including the fact that Haring was routinely checking on Plaintiff and found no immediate need.  [Ex. 7]

Instead, the decision to place Plaintiff in Segregation Unit 1 was based on safety and security concerns following his combative and aggressive behavior, which included threats to staff, noncompliance with orders, and physical resistance.  Plaintiff's conduct continued to pose a threat to himself, jail officers, and the safety and order of the jail throughout the day. [Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8] Specifically, at approximately 11:42 a.m., Lieutenant Haring documented that Plaintiff was striking the cell door and threatening staff. [Ex. 3]  Then, at approximately 12:10 p.m., Plaintiff was still yelling threats such as "I'm gonna beat your ass" and spitting at the window. [Ex. 3]  Nevertheless, Haring ensured Plaintiff received meals and basic care, and monitored him regularly while he remained in segregation. [Ex. 1, pp. 34, 37; Ex. 7]

Once Plaintiff was no longer acting aggressively and no longer posed a security risk, he was moved from segregation to C-Pod North at approximately 5:38 p.m. [Ex. 3; Ex. 5; Ex. 6; Ex. 7; Ex. 8] Then, on February 10, 2022, Plaintiff was evaluated by jail medical personnel, who noted

that he had been in a fight with another detainee on February 9, resulting in a black right eye. [Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 12] He was provided with Tylenol and ice packs and did not require further or emergent medical treatment. [Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 12]

Even when the evidence is viewed in the light most favorable to Plaintiff, the record does not support the finding that Plaintiff had an objectively serious medical need on February 9, 2022, or that Lieutenant Haring responded in an objectively unreasonable manner. To the contrary, the undisputed facts show that Haring acted reasonably and within the bounds of his role in monitoring Plaintiff and ensuring his care and safety, as well as the safety of others and the order of the jail, during a brief period of segregation.

These facts are fundamentally inconsistent with a claim of deliberate indifference. Haring's actions were not only reasonable; they reflected appropriate supervision and responsiveness to a volatile situation.

Plaintiff's deliberate indifference claim against Lieutenant Haring fails because the record contains no evidence that Haring was aware of, or disregarded, any objectively serious medical need. Rather, the undisputed facts show that Plaintiff was placed in Segregation 1 South on February 9, 2022, due to his escalating and dangerous behavior, including threats toward another inmate, yelling, spitting, and refusing to cooperate with officers, and that his continued volatility throughout the day posed a legitimate safety risk to himself, other detainees, and jail staff.

While Plaintiff may have preferred different housing conditions or amenities during that time, his segregation placement was a necessary and temporary security measure based entirely on his conduct, not any known medical need. There is no indication that Plaintiff was experiencing a medical emergency, nor any evidence that Haring observed symptoms requiring medical attention.

Once Plaintiff calmed down and no longer posed a threat, he was promptly moved out of segregation, given access to his property, allowed to shower, and received routine lockdown privileges. Plaintiff's complaints about the segregation cell, such as the smell or access to water, do not establish that Haring was subjectively aware of a serious medical risk, let alone that he deliberately ignored one. Plaintiff was also seen by medical staff within a reasonable time after he had deescalated. Under these facts, Plaintiff cannot meet either the objective or subjective components of a Fourteenth Amendment deliberate indifference claim, and summary judgment in favor of Defendant Lieutenant Haring on Count III of Plaintiff's Complaint is warranted.

**D. Defendants Should Be Granted Summary Judgment On All Counts On The Basis Of Qualified Immunity.**

Defendants are entitled to qualified immunity, which protects government officials performing discretionary functions from liability unless their conduct violates clearly established statutory or constitutional rights that a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This doctrine is designed to balance holding public officials accountable with shielding them from harassment, distraction, and liability when they act reasonably within the scope of their duties. *Id.*

To overcome qualified immunity, Plaintiff must satisfy the demanding two-part test requiring proof that (1) a constitutional violation occurred, and (2) the violated right was clearly established at the time of the conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010). Considering the constitutional question first "is often beneficial," in part because it "promotes the development of constitutional precedent." *Id.*; *see also Plumhoff v. Rickard,* 572 U.S. 765, 774 (2014). Such an approach also

22

can promote the stability and clarity of constitutional precedent. *See Camreta v. Greene,* 536 U.S. 692 705-06 (2011).

As detailed herein, Plaintiff's allegations of excessive force, failure to intervene, and deliberate indifference are contradicted by the undisputed evidence and fail to demonstrate a constitutional violation.  Plaintiff's own combative and volatile behavior, causing another to fear for his life, and then in segregation, causing disruption to the jail through actions that included yelling, spitting, and striking his cell door, all posed a legitimate threat to himself, jail staff, and other inmates, justifying Defendants' use of force to maintain safety and order.  [Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8] This use of force was objectively reasonable under clearly established law, as officers are entitled to deference when making split-second decisions to address threats. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Furthermore, even if a constitutional violation could be shown, Plaintiff fails to demonstrate that the law was clearly established such that a reasonable officer would know their conduct was unlawful.  The second prong of the qualified immunity analysis ensures that a governmental official is held liable only when the contours of the right allegedly violated are "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff,* 572 U.S. at 778-79.  The Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), emphasizes an objective reasonableness standard for excessive force claims by pretrial detainees, requiring courts to give officers deference in making split-second decisions in volatile situations.  The Seventh Circuit similarly holds that force proportionate to the threat posed is justified. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Here, Defendants Officer Decker and Lieutenant Richert are entitled to qualified immunity because their actions were objectively reasonable and did not violate any clearly established

23

constitutional rights.  Plaintiff, who was undergoing methamphetamine withdrawal, engaged in aggressive and threatening behavior that posed an immediate safety risk to both staff and inmates. One inmate reported fearing for his safety, and Plaintiff became combative when officers attempted to move him to segregation.  In response, the officers used only the amount of force and control measures necessary to restore order and ensure safety. The use of short-term segregation, lockdown, and limited force was not punitive, but a measured and appropriate response to an escalating threat in a correctional environment. The actions taken were consistent with maintaining institutional safety and did not exceed constitutional boundaries. No clearly established law would have put the officers on notice that such conduct was unlawful under the circumstances.  Further, Defendant Lieutenant Sellers is entitled to summary judgment on Count I because he had no involvement or interaction with Plaintiff on either February 9, 2022 or March 3, 2022. [Ex. 10]

Accordingly, Defendants Sergeant Dawdy and Lieutenant Foster are also entitled to qualified immunity, as their actions were objectively reasonable and did not violate any clearly established constitutional rights.  Plaintiff's allegations against Sergeant Dawdy and Lieutenant Foster are limited to a purported failure to intervene.  However, because the force used by Officer Decker and Lieutenant Richert was not excessive and was objectively reasonable under the circumstances [and Lieutenant Sellers was not involved in the incident and therefore, did not use any force], there was no constitutional violation requiring intervention.  As such, there was no duty to intervene, and Sergeant Dawdy and Lieutenant Foster are likewise protected by qualified immunity.

Finally, Defendant Lieutenant Haring is entitled to qualified immunity as his actions were also objectively reasonable and did not violate any clearly established constitutional rights. Plaintiff's pre-existing seizure disorder, for which he was receiving prescribed medication

throughout his incarceration, and his methamphetamine withdrawal did not establish an emergent medical need that was left unaddressed rising to the level of deliberate indifference. [Ex. 1] Lieutenant Haring continuously monitored Plaintiff, ensured timely delivery of meals, promptly restored privileges once Plaintiff was no longer a safety risk, and provided appropriate care consistent with constitutional standards. [Ex. 3; Ex. 4; Ex. 7]  When Plaintiff was seen on February 10, 2022, he was provided with Tylenol and ice packs, upon request, and did not require further or emergent medical treatment.  [Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 12]  Therefore, the constitutional rights at issue were not clearly established in this context such that Lieutenant Haring would have known their conduct was unlawful.

Because Plaintiff cannot satisfy either prong of the qualified immunity test; that is, he cannot show a constitutional violation or that the right was clearly established at the time, all Defendants are entitled to qualified immunity.  This doctrine shields them from litigation and liability arising from their reasonable performance of official duties.  For these reasons, summary judgment should be granted in favor of Defendants on all counts of Plaintiff's Complaint.

**E.  <u>Defendants Should Be Granted Summary Judgment On All Counts Because Plaintiff Cannot Establish Injury or Causation.</u>**

The Supreme Court has made clear that while the absence of a serious injury does not automatically defeat an excessive force claim, the extent of injury remains a relevant factor in assessing whether the force used was excessive. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Consistent with this, the Seventh Circuit has repeatedly held that de minimis injuries do not rise to the level of a constitutional violation. *Gutierrez v. Kermon*, 722 F.3d 1003, 1011 (7th Cir. 2013). Additionally, where a plaintiff cannot show that any injury was proximately caused by the

defendant's actions, summary judgment is appropriate. *Estate of Allen v. City of Chicago*, No. 16-cv-8094, 2018 WL 4495982, at *4 (N.D. Ill. Sept. 19, 2018).

Here, Plaintiff's Count I (excessive force) and Count III (deliberate indifference) claims fail because he suffered no more than minimal injury and cannot establish a causal connection between the defendants' conduct and any alleged harm. As a result, Count II (failure to intervene) necessarily fails as well, because such a claim requires an underlying constitutional violation. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (failure to intervene claim requires proof of a constitutional violation and that the defendant had a realistic opportunity to prevent it).

The record demonstrates that Plaintiff had a long history of seizure activity well before the events at issue. He was diagnosed with epilepsy following a 2016 gunshot wound to the head and subsequent brain surgery, and he had been prescribed anti-seizure medication, which he received consistently during his incarceration at Madison County Jail. [Ex. 1, pp. 38-41; Ex. 2] Plaintiff experienced seizures prior to the alleged incident, including during his court appearance on or around February 3 or 4, 2022, just days before the events in question, and during his stay at the St. Louis County Infirmary immediately prior to his transfer. [Ex. 1, pp. 40, 44] Given this undisputed medical history, Plaintiff's seizures clearly predate the use of force he now challenges and cannot be causally linked to the defendants' conduct. *See Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007); *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008).

Although Plaintiff now claims that his seizures worsened following the incident, he has presented no medical evidence demonstrating that the use of force or any alleged delay in medical attention caused or exacerbated his condition. Any increase in seizure activity is more reasonably attributed to unrelated factors such as methamphetamine withdrawal, environmental stressors, or the natural progression of his preexisting medical condition. Indeed, Plaintiff himself testified that

26

the need for medical attention during a seizure "depends on how bad I beat myself up or how bad it is," and that "if it is one I can control, it is not that bad." [Ex. 1, p. 55]  This admission undermines any suggestion that jail staff should have recognized or responded to an objectively serious medical need requiring emergency care.  A detainee who acknowledges the ability to self-manage some seizures cannot plausibly claim that correctional officers acted unreasonably or with deliberate indifference when no obvious medical emergency was present.

Furthermore, Plaintiff's jail file contains numerous "Refusal of Treatment Medical Release Forms," demonstrating a consistent pattern of refusing prescribed seizure medication, including on February 9, 2022. [Ex. 2; Ex. 16, Plaintiff's Refusal of Medicine and Treatment Files] Plaintiff's seizure activity predates this event and is attributable to his failure to take medication as prescribed.  On May 25, 2023, Plaintiff attended a medical appointment resulting in adjustments to his seizure medication. [Ex. 1, pp. 56, 62]  After these changes were implemented and Plaintiff resumed taking his medication, his seizure activity reportedly ceased, strongly indicating that any increase in seizures was due to inadequate medical management rather than unconstitutional conduct. [Ex. 1, p. 62]

Because Plaintiff cannot demonstrate that he suffered more than a minimal injury, nor can he establish any causal link between defendants' actions and his alleged harm, his claims of excessive force and deliberate indifference fail as a matter of law.  And without an underlying constitutional violation, his failure to intervene claim must also be dismissed.  Accordingly, Defendants are entitled to summary judgment on all counts.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants Officer Decker, Lieutenant Richert, Lieutenant Sellers, Lieutenant Foster, and Sergeant Dawdy respectfully move for summary judgment dismissing Plaintiff's Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Respectfully Submitted,

**BLITZ, BARDGETT & DEUTSCH, LC**

By:    */s/ Heidi L. Eckert*
Heidi L. Eckert, #6271612
120 S. Central Avenue, Suite 1500
St. Louis, Missouri 63105
Telephone:  314-863-1500
Facsimile:  314-863-1877
heckert@bbdlc.com

*Attorneys for Defendants*

## Certificate of Service

I hereby certify that on this 16th day of October 2025, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Heidi L. Eckert*_____