UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOHN P. CHAPMAN,

       Plaintiff,

    v.

OFFICER DECKER, SERGEANT RICHERT,
SGT. HARING, SGT. CALDWELL, LT.
SELLERS, OFFICER DAWDY, and LT. FOSTER,

       Defendant.

Case No. 23-cv-3200-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on the defendants' motion for summary judgment (Doc. 54). Plaintiff John P. Chapman has responded to the motion (Doc. 58), and the defendants[1] have replied to that response (Doc. 62). The Court also considers the defendants' motion to deem admitted the facts in their statement of material facts within their motion pursuant to SDIL-LR 56.1(g) (Doc. 60). Chapman has not responded to that motion.

## I.    Background

Chapman filed this case *pro se* complaining that, with the exception of defendant Sgt. Caldwell,[2] the defendants used excessive force by beating him on February 9, 2022, and on March 3, 2022, they failed to intervene in the use of excessive force, or they failed to provide adequate medical care after the February 9, 2022, excessive force. The defendants contend that any force they used on February 9, 2022, was objectively reasonable and was executed without a reasonable opportunity to intervene, that summoning medical care that did not arrive until the

---

[1] In this order, the Court refers to each defendant by the name they use in their motion, not the names Chapman uses in his pleading.
[2] The Court dismissed Caldwell without prejudice in its screening order (Doc. 10).

following day was reasonable, and that there was no force used on March 3, 2022.  They also argue that they are entitled to qualified immunity and that, in any case, any injury Chapman suffered was not caused by their conduct.

The Court will grant in part and deny in part the defendants' motion for summary judgment because there are genuine issues of material fact about whether the defendants used excessive force against Chapman, but not whether a defendant unreasonably failed to intervene when they had a chance or unreasonably failed to summon medical care for Chapman.

**II.      Summary Judgment Standard**

Summary judgment is appropriate only if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the burden of establishing that no material fact is genuinely disputed.  *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).

Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (internal quotations omitted).  The Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence."  *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) (internal quotations omitted).  On the contrary, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a

genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotations omitted).

Nevertheless, the Court need not find a genuine issue of material fact where the story of one side is blatantly contradicted by the record such that no reasonable jury could believe it. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (video evidence). Under this rule, video evidence "can resolve a genuine dispute at summary judgment[, but] only if it offers 'irrefutable evidence' that 'utterly discredit[s]' countervailing factual assertions." *Pam v. City of Evansville*, 154 F.4th 523, 529 (7th Cir. 2025) (citing *Gant v. Hartman*, 924 F.3d 445, 450 (7th Cir. 2019)); *Raddant v. Douglas Cnty., Wisc.*, 170 F.4th 583, 591-92 (7th Cir. 2026).

## III.   Facts

### A.   Defendants' Statement of Material Facts

As a preliminary matter, the Court considers whether to deem the facts in the defendants' statement of material facts ("SOMF") admitted because Chapman did not counter them in his motion in the form required by SDIL-LR 56.1. That rule contemplates that the summary judgment movants include in their brief a SOMF "which sets forth each relevant, material fact in a separately numbered paragraph" with "specific citation(s) to the record." SDIL-LR 56.1(a). The opposing party's brief must then contain a response to the SOMF with corresponding paragraphs stating whether the fact is admitted or disputed, in whole or in part, or is not supported by the record; the disputed facts must contain their own citation to the record. SDIL-LR 56.1(b). "All material facts set forth in a [SOMF] . . . shall be deemed admitted for purposes of summary judgment unless specifically disputed." SDIL-LR 56.1(g).

The defendants complied with SDIL-LR 56.1(a) in their motion, but Chapman did not include in his brief corresponding paragraphs admitting, disputing, or challenging the supporting

3

evidence for those facts. The defendants ask the Court to deem the facts in its SOMF admitted in light of SDIL-LR 56.1(g).

While local court rules are designed to facilitate orderly litigation and to achieve the ends of justice, the Court has discretion to overlook a transgression of those rules, *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 923 (7th Cir. 1994), and the inherent authority to excuse it. *Murata Mfg. Co. v. Bel Fuse, Inc.*, 242 F.R.D. 470, 474 (N.D. Ill. May 2, 2007). Where no party suffers prejudice from a failure to follow the local rules, the Court may exercise flexibility to excuse noncompliance.

The defendants have suffered no prejudice from Chapman's failure to counter the facts in their SOMF in corresponding numbered paragraphs or to submit his own statement of additional material facts. Chapman's brief contains only three pages of factual allegations, supported by citations to the record, that have been relatively easy for the Court to sort through and to locate factual disputes. The Court is confident that the defendants' able counsel was not prejudicially hampered by the format of Chapman's presentation. Accordingly, the Court believes it is appropriate to allow this departure from SDIL-LR 56.1 in the interests of justice, and it will deny the defendants' motion to deem admitted the facts in its SOMF. Had Chapman's statement of facts been longer and more convoluted or not well supported by citations to the record, the Court may have reached a different conclusion.

B. Relevant Facts

The admissible evidence and the reasonable inferences that can be drawn from it, viewed in Chapman's favor, establish the following relevant facts.

Chapman was booked into the Madison County Jail ("Jail"), where the defendants were employed, on January 26, 2022. At the time he arrived, he had a history of neurological

4

problems from a 2016 gunshot wound to the head.  Those problems included seizures and epilepsy that required him to take medications, which he was prescribed and offered at the Jail, although he refused them on numerous occasions.  His seizures and need for medication were noted on his booking card.  Chapman was experiencing seizures in January 2022 when he arrived at the Jail and even had one on February 4, 2022, in a court hearing.  When he arrived at the Jail, he was also experiencing symptoms of withdrawal from methamphetamine.

The events that gave rise to this case began shortly after 11:00 a.m. on February 9, 2022, while Chapman was a pretrial detainee.  Chapman was yelling at another detainee in the G-South cellblock to give him his tablet computer back.  Officer Decker heard Chapman propose to another detainee that they fight, and the other detainee said he was in fear for his life.  Decker summoned assistance, stating that Chapman had been fighting and was refusing to return to his cell.  Actually, the detainees had been in a war of words without any physical contact.  Defendants Lt. Richert, Lt. Haring, and Sgt. Dawdy responded to Decker's call, and Chapman returned to his cell.  Decker and Richert then went to Chapman's cell to move him to Segregation Unit 1 for fighting.  Chapman initially refused multiple orders to leave his cell as ordered, but eventually did after Richert took hold of him by his arm.  Decker and Richert accompanied him to the hallway.

In the hallway, Chapman was yelling but not physically resisting, so Decker, Richert, and Haring applied physical force to Chapman for several minutes so Dawdy could handcuff him.  Specifically, Chapman was ordered to get down on his hands and knees, and after Chapman was on one knee, Dawdy placed a cuff on Chapman's right hand.  Decker then punched Chapman on the right side of his head three times, which caused Chapman to fall on his stomach.  Dawdy was then able to place the other cuff on Chapman's left hand.  Chapman expressed disbelief that

5

Decker had hit him in the head and yelled that he had just had brain surgery.  After Chapman was fully in handcuffs and lying on the ground, he looked up, and Richert kicked him in the eye. Chapman was not resisting during the incident, and no officer instructed him to stop yelling or resisting.

Dawdy and Decker were able to get Chapman to his feet again and to frog-march him down the hall toward Segregation Unit 1.  Chapman saw Lt. Foster in the hallway and asked why the officers were "doing this," and Foster said it was out of his hands and he was sorry.  The incident in the hallway is recorded on video, but the relevant part of the image is obscured by the video header, the video is missing crucial seconds, and it is essentially unhelpful except to show that Chapman did not have a black right eye as he walked down the hall after being handcuffed. Later, both of Chapman's eyes became black, his ear was bloody, and he felt pain.

Once in segregation, Chapman yelled and threatened the jail officers present—Decker, Haring, and Dawdy.  He knelt down as instructed but refused to lie down so the handcuffs could be removed safely.  Haring applied force to Chapman's legs to force him to lie down.  When one cuff was removed, Chapman did not comply with orders to keep his free arm flat on the floor and instead used it to try to push up from his prone position.  Decker applied physical force to the back of Chapman's shoulder to try to keep him down. When Chapman continued to resist, Haring sprayed him in the face with a one-second blast of oleoresin capsicum ("OC" or pepper) spray.  Chapman then allowed the officers to remove the remaining cuff as they wanted to. Decker told Chapman to rinse his face with running water from his sink, told the nursing staff about the incident, and asked them to see Chapman as soon as they could safely do so.

In segregation, Chapman was regularly monitored.  He verbally threatened jail staff, banged on his cell door, and spat at the window in the door.  By about 5:30 p.m., Chapman had

calmed down enough so that Foster approve his removal from segregation and placement in cellblock C-North, where he was allowed to shower. As a result of the events of February 9, 2022, Chapman was placed on lockdown for 30 days. He had a seizure in the early hours of February 10, 2022.

On February 10, 2022, Jail medical staff evaluated Chapman and noted he had a slightly swollen black right eye that he said was from fighting. The black eye did not result from a fight with another detainee because there was no physical contact during that fight. Instead, it came from the force used by one or more of the defendants. Medical staff gave Chapman Tylenol and ice packs but did not provide any other care or treatment. While not noted in his medical records, Chapman also had a bloody ear, headaches and a sudden increase in seizure activity he attributes to the incident. His increased seizures continued until the beginning of June, when he received medicine from a neurologist. On February 14, 2022, Chapman was sent outside the jail for a CT scan of the head where the doctor noted no acute fracture or joint dislocation and unremarkable soft tissues. He had another CT scan of the head on May 24, 2022, after which the doctor found no acute intracranial process and postoperative changes of the left frontal craniotomy and mild left frontal lobe encephalomalacia. While Chapman offers no expert proof of causation, he is competent to testify about his pain and the increased frequency of his seizures beginning after February 9, 2022.

On March 3, 2022, Chapman had a migraine headache and was fed up with another inmate's making loud noises, so he submitted a request for mental health care. That evening, Officer Sellers took Chapman from his lockdown cell to a segregation cell and then kicked him three times on the right side of his body and one or two times on the left. He remained on the floor for several days and in that segregation cell on suicide watch for five days. Chapman was

7

in pain from the force Sellers used on him.

In September 2023, Chapman filed this lawsuit under 42 U.S.C. § 1983 alleging violation of his Fourteenth Amendment due process rights based on the defendants' alleged use of excessive force, failure to intervene, and deliberate indifference to his medical needs. Specifically, the Court identified these claims in Chapman's Complaint:

**Claim 1:** Eighth or Fourteenth Amendment[3] excessive force claim against Decker, Richert, and Sellers for allegedly beating Plaintiff on February 9, 2022, and March 3, 2022.

**Claim 2:** Eighth or Fourteenth Amendment failure to intervene claim against Dawdy and Foster for failing to intervene in the beating by Decker or Richert on February 9, 2022.

**Claim 3:** Eighth or Fourteenth Amendment deliberate indifference claim against Haring for placing Plaintiff in a cell without medical care after the beating on February 9, 2022.

(Doc. 10 at 3).

## IV.   Analysis

### A.   Count 1:  Excessive Force

To prove a defendant used excessive force in violation of the Fourteenth Amendment, a pretrial detainee must show that the defendant acted purposefully, knowingly, or perhaps even recklessly in response to conditions posing an excessive risk to his health or safety and that the defendant's actions were objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 395-97 (2015).  Thus, the appropriate standard for a pretrial detainee's claim is not whether the defendant was subjectively aware that their use of force was unreasonable. *Id.* at 396-97;

---

[3] It was unclear at the time whether Chapman was a convicted prisoner, in which case the Eighth Amendment would apply, or a pretrial detainee, in which case the Fourteenth Amendment would apply. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350-54 (7th Cir. 2018) (discussing the different legal standards applied to claims by convicted individuals versus pretrial detainees).  It is clear now that he was a pretrial detainee.

*Raddant v. Douglas Cnty., Wisc.*, 170 F.4th 583, 590 (7th Cir. 2026).

As with other uses of the objective standard, the determination turns on the facts and circumstances of each particular case from the perspective of a reasonable officer in the defendant's position and what they knew at the critical time. *Kingsley*, 576 U.S. at 397 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *Raddant*, 170 F.4th at 590. The objective circumstances to consider include, but are not limited to:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). Of course, the Court may consider video evidence of an occurrence in its evaluation of the use of force. The Court must consider in its determination the legitimate interest in managing the jail and must defer to the judgment of jail officials as to the policies and practices necessary to maintain institutional security. *Kingsley*, 576 U.S. at 397 (citing *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

### 1.    February 9, 2022: Hallway Incident

Chapman claims that Decker and Richert used excessive force against him in the Jail hallway on the morning of February 9, 2022.[4] There is sufficient evidence for a reasonable jury to find they used excessive force in that incident. Specifically, Chapman testified that he did not physically resist, although he admits he was yelling, when the officers began to put him in handcuffs. He testified that, while he was being cooperative, Decker punched him three times in the head and that, after he was in handcuffs lying on the ground, Richert kicked him in the eye. The picture he paints is of a compliant detainee who was assaulted gratuitously with purposeful

---

[4] Chapman does not complain of Sellers's conduct on February 9, 2022.

punches and kicks.

The video evidence of the encounter is not clear enough to require a reasonable jury to reject Chapman's testimony. The details are hidden behind a header bar, and the video omits several seconds in which the attack Chapman describes may have happened. As a consequence, the video does not provide "irrefutable evidence" to discredit Chapman. The Court must take his version of events as true at the summary judgment stage.

Under the facts as Chapman tells them, a reasonable officer would not have used the force Decker and Richert did. Considering that Chapman was compliant with officers' instructions, there was no need for force beyond the minimal force necessary to place handcuffs on. Chapman posed no security threat that reasonably called for the force used. Further, Chapman suffered pain at the time and a swollen black eye and increased seizure activity later. A reasonable jury could find that the force Decker and Richert used against Chapman was objectively unreasonable. Thus, the Court cannot grant summary judgment for Decker or Richert for lack of evidence on this aspect of Count 1.

2.    February 9, 2022:  Segregation Cell Incident

It appears that Chapman is also accusing Decker, and possibly Haring,[5] of excessive force for their involvement in removing the handcuffs once he reached the segregation cell on the morning of February 9, 2022. Decker was working with Dawdy and Haring to place Chapman in a segregation cell immediately after the incident in the hallway. Chapman refused to comply with officers' instructions to lay down on the floor, so Haring applied force to

---

[5] Haring is not named as a defendant in Count 1, the excessive force claim, and Chapman never sought to amend his complaint to include him as an excessive force defendant. The Court considers Haring's actions anyway because the defendants addressed such a claim in their summary judgment motion and because Haring would be entitled to summary judgment even if such a claim had been pled.

10

Chapman's legs to force him to lay down.  Chapman also refused instructions to keep his free hand on the floor once Dawdy had removed the left handcuff and instead tried to raise up from the floor.  Decker applied force to his shoulder to try to keep him down, and when Chapman continued to try to raise up, Haring sprayed his face with a short burst of OC spray.  No evidence shows Dawdy applied any force other that what was necessary to uncuff Chapman, so the only force in issue is Decker's and Haring's.

Again, the force used was clearly purposeful, intended to force compliance with instructions to allow removal of handcuffs from an aggressively resisting detainee without endangering officers' safety.

Further, no reasonable jury would find the force used in the segregation cell unreasonable.  Unlike in the hallway, Chapman was resisting commands from officers to comply with uncuffing procedures Jail officials deemed, in their judgment, necessary to maintain security and officer safety.  Decker, Haring, and Dawdy reasonably perceived that Chapman posed a risk to their safety; they were in close quarters, and he was being aggressive and yelling threats.  The force Haring and Decker used was reasonable to obtain compliance with the uncuffing procedure.  Haring's force on Chapman's legs, Decker's pressing on Chapman's shoulder, and Haring's short burst of OC spray were reasonable where Chapman refused to comply with the procedure after being given instructions.  Their force was limited to what was necessary to subdue an aggressive and threatening detainee and, indeed, were effective to accomplish that goal without violence on either side.  Finally, there is no evidence of lasting injury to Chapman, only short-term OC spray exposure that he was told to rinse off.  The officers' purposeful conduct was objectively reasonable, so the Court will grant summary judgment to Decker and Haring on this aspect of Count 1.

11

   3.      March 3, 2022: Segregation Cell Incident

Chapman claims that on March 3, 2022, Sellers took him from his lockdown cell to a segregation cell, kicked him five or six times in the sides, and then left him on the floor of the segregation cell, where he remained on the floor for several days.[6]  Sellers claims he had no contact with Chapman on March 3, 2022, and that there was no incident.  However, the Court must take the events as Chapman described them in his testimony.

The facts from Chapman's testimony show that Sellers conduct in kicking him was purposeful and that such force was not justified by any legitimate reason.  Thus, a reasonable jury could find Sellers liable for excessive force for the March 3, 2022, incident.

   B.      Count 2:  Failure to Intervene

Chapman claims Dawdy and Foster failed to intervene to stop the excessive force used against him in the hallway on February 9, 2022.  An officer can be liable for failing to intervene to stop the excessive force of another when he has reason to know the other officer is using excessive force, he has a realistic opportunity to intervene to prevent the harm, and he fails to do so.  *Jackson v. City of Madison*, 176 F.4th 1005, 1016 (7th Cir. 2026) (citing *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997)).  And under the objective standard of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the plaintiff must show the defendant "intend[ed] to carry out a certain course of actions" and that the course was objectively unreasonable.  *Kemp v. Fulton Cnty.*, 27 F.4th 491, 497 (7th Cir. 2022) (failure to protect).  Showing negligence is not enough.  *Id.*  In other words, the plaintiff must show the defendant acted purposefully, knowingly, or recklessly to create a risk for the plaintiff when a reasonable officer in his position would have appreciated the risk and acted otherwise.  *Pittman by & through Hamilton v.*

---

[6] Chapman does not complain of Decker's or Richert's conduct on March 3, 2022.

*Madison Cnty., Ill.*, 108 F.4th 561, 569 (7th Cir.), *reh'g denied,* No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied,* 145 S. Ct. 1154 (2025).

    1.    <u>Dawdy</u>

Dawdy was one of the officers participating in the effort to handcuff Chapman in the hallway. Chapman does not complain about Dawdy's conduct except to assert that he failed to intervene in Decker's and Richert's conduct. He argues that the video shows he was on the ground for at least four minutes, which would have given Dawdy a reasonable opportunity to intervene to stop Decker's punching and Richert's kicking Chapman.

Even taking as true Chapman's statements that Decker and Richert used excessive force against him, no evidence pushes Chapman's failure to intervene claim against Dawdy over the line from the possible to the probable such that a reasonable jury could find him liable. Nothing Chapman testified to could lead a reasonable jury to conclude that Dawdy made a purposeful, knowing, or reckless decision not to intervene to stop Decker or Richert. Further, there is no evidence that could lead the jury to conclude that a reasonable officer in Dawdy's position would have appreciated the risk to Chapman of excessive force in what the Court accepts as handcuffing a cooperative detainee. Nor is there evidence that a reasonable officer in Dawdy's circumstances would have acted any differently than Dawdy did. "The law does not require officers to act as fortune tellers, anticipating when their fellow officers might use excessive force in the future and knowing to intervene before they do." *Stewardson v. Titus*, 126 F.4th 1264, 1279 (7th Cir. 2025).

Chapman describes the events happening in fairly quick succession to an unresisting detainee. Dawdy was busy cuffing Chapman's right hand at or near the time Decker hit him in the head and had just cuffed Chapman's left hand when Richert kicked him in the eye. No

13

evidence suggests a reasonable officer in Dawdy's position would have appreciated that Decker or Richert posed a real risk of using excessive force on Chapman in an otherwise cooperative encounter or that such a reasonable officer would have chosen to abandon the task of handcuffing Chapman to act in time to stop any unconstitutional conduct.

The fact that Chapman was on the ground for four minutes does not reasonably lead to an inference that Dawdy or a reasonable officer in Dawdy's position had four minutes to appreciate the risk to Chapman and to intervene in a way that could have stopped Decker or Richert.  In fact, the evidence does not support that Dawdy had any advance notice of Decker's or Richert's conduct, and without advance notice, no reasonable officer in Dawdy's position would have been able to appreciate the risk or to intervene to stop it.

And as the Seventh Circuit Court of Appeals has repeatedly stated, "summary judgment is the 'put up or shut up' moment in the life of a case." *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 612 (7th Cir. 2008).  Chapman has simply not pointed to any evidence that could be used to show Dawdy possessed the requisite state of mind or that he behaved in an objectively unreasonable manner.  Accordingly, the Court will grant summary judgment for Dawdy on Count 2.

        2.    <u>Foster</u>

Chapman asserts that Foster failed to intervene in the use of excessive force when Chapman saw him in the hallway as he was being walked to the segregation unit.  He asked Foster, "Why are you doing this?" and asked him for help.  Foster replied, "It is out of my hands and I am sorry."

Foster did not enter the picture until after—and down the hall from—Decker's and Richers's alleged use of excessive force.  No reasonable jury could find an officer in Foster's

position would have appreciated the danger to Chapman such that he could have intervened to stop it. In fact, the evidence shows he was only aware of it after it had occurred.

Further, to the extent Chapman believes Foster should have intervened to stop any excessive force once Chapman reach the segregation unit, there is no evidence that any force was excessive. Without excessive force, an officer cannot be liable for failure to intervene to prevent excessive force. *Jackson v. City of Madison*, 176 F.4th 1005, 1016 (7th Cir. 2026) (first element of failure to intervene is "that excessive force was being used"); *Doxtator v. O'Brien*, 39 F.4th 852, 864-65 (7th Cir. 2022). And no facts suggest a reasonable officer in Foster's position would have known any unconstitutional force was planned to be perpetrated in the segregation unit. There was simply no unconstitutional conduct that needed to be stopped, and to the extent there might have been, an officer in Foster's position would not have known it was a risk.[7] The most the evidence suggests is that Foster declined to intervene in a security response he was not involved in and had no legitimate reason to stop. Indeed, it was out of his hands.

Because no evidence suggests Foster behaved in an objectively unreasonable way, the Court will grant summary judgment for him on Count 2.

C.      Count 3: Medical Care

Chapman claims Haring responded unreasonably to his medical needs by placing him in the segregation cell on February 9, 2022, after the hallway incident and after spraying him with OC spray without summoning medical care.

To prevail on this claim, Chapman must prove he suffered from an objectively serious

---

[7] The Court does not intend to be Pollyanna-ish; it knows that the risk of excessive force is always present in the correctional environment. But a reasonable officer, aware of its prevalence, must still have some reasonable basis to believe it will be used in a particular circumstance before they can be held liable for the failure to intervene.

15

medical need; that Haring acted purposefully, knowingly, or recklessly; and that his actions were objectively unreasonable. *See McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022); *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Where the plaintiff sues a non-medical defendant for inadequate medical care, the Court recognizes the circumstances are different from when he sues a medical defendant. This is because jails and other correctional facilities often separate the responsibilities of medical professionals to provide inmate healthcare from those of other security or administrative staff to keep the institution secure and in good order. *McGee*, 55 F.4th at 569; *Miranda*, 900 F.3d at 343.

"When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention," *Miranda*, 900 F.3d at 343, and may "defer to the professional medical judgments of the physicians and nurses treating the [inmate] in their care without fear of liability for doing so," *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). This is so unless the non-medical officer "had reason to know that their medical staff were failing to treat or inadequately treating an inmate." *Miranda*, 900 F.3d at 343. "This remains true even when an inmate is in obvious distress and even when the medical staff has misdiagnosed an inmate—or worse, accused him of faking a very real illness." *McGee*, 55 F.4th at 573 (citing *Miranda*, 900 F.3d at 343).

Haring first contends that Chapman's medical needs were not serious. The Court assumes without deciding that a reasonable jury could find that the blows Chapman suffered to the head, his history of brain trauma and seizures, and the OC sprayed in his face would constitute a serious medical need, especially when he claimed to have two black eyes, a bloody

ear, pain, and increased seizure activity, and when he was given treatment the following day.[8] The question then rests on whether Haring's response to that need was objectively reasonable.

The evidence shows that, after Chapman was placed in the segregation cell and was sprayed with OC spray, Decker instructed Chapman to rinse off his face with the running water from the sink in his cell. Decker also informed the Jail nursing staff of the incident involving Chapman. Haring did nothing himself in response to Chapman's medical plight. Jail medical staff saw him the following day, February 10, 2022, and gave him Tylenol and ice packs. On February 14, 2022, Chapman was sent for a CT scan of the head where the doctor noted no acute fracture or joint dislocation and unremarkable soft tissues.

The Court assumes Haring made a purposeful, knowing, or reckless decision not to do anything more to obtain medical care for Chapman. However, a reasonable officer in Haring's position would not have contacted the Jail medical staff for treatment of Chapman because it was clear another officer had already asked medical staff to see Chapman as soon as they could safely do so. Indeed, someone from the nursing staff saw Chapman the following day to evaluate his injuries. Haring was entitled to rely on that medical staff to properly evaluate and treat Chapman, and he cannot be held liable for any shortcomings on their part such as a delayed response, an incomplete exam, or improper follow-up investigation and treatment. Because Haring acted reasonably in light of the fact that the medical staff had already been alerted that Chapman needed care and he could rely on them to provide that care, no reasonable jury could find he behaved in an objectively unreasonable manner.

---

[8] Chapman complains about his treatment by Jail medical staff, but he did not sue any medical personnel in this case.

D.      Qualified Immunity

The Court addresses the question of qualified immunity as it applies to the excessive force claims that have survived summary judgment so far.

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026).  The qualified immunity test has two prongs:  (1) whether the officer violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct.  *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018).  The Court turns to the second prong as applied to the excessive force claims that have eluded summary judgment to this point.

Under the second prong, the law at the time of the conduct "must have placed the constitutionality of the officer's conduct beyond debate" such that "every reasonable official would understand that what he is doing is unlawful."  *Wesby*, 583 U.S. at 63 (internal quotations omitted); *accord Zorn*, 146 S. Ct. at 930.  It must have been "settled law," that is, it must have been "dictated by controlling authority or a robust consensus of cases of persuasive authority."  *Wesby*, 583 U.S. at 63 (internal quotations omitted).  Generally, this requires a high degree of specificity in the precedent so that every reasonable officer would have been alerted to the law in the particular circumstances.  *Zorn*, 146 S. Ct. at 930; *Wesby*, 583 U.S. at 63.  "Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice."  *Zorn*, 146 S. Ct. at 930 (citing *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)).  And it is incumbent on the plaintiff to show the clear establishment of the law in the particular circumstances, but the failure to do so is not fatal by itself.  *Taylor v. Schwarzhuber*, 132 F.4th

18

480, 487 (7th Cir. 2025).

Here, the issue is whether it was clearly established that a defendant can use force on a pretrial detainee in the circumstances shown in this case.  The defendants take the position in their motion that Chapman was actively resisting and refusing orders on February 9, 2022, and that no contact even occurred on March 3, 2022.  But on summary judgment, as noted earlier, the Court must take the plaintiff's testimony as true.  With respect to the February 9, 2022, hallway incident, the Court assumes Chapman was not resisting orders to facilitate being handcuffed or otherwise being unruly, and with respect to the March 3, 2022, incident, the Court assumes Chapman was being placed in a segregation cell without any resistance.

Decker, Richert, and Sellers are not entitled to qualified immunity for those incidents.  The evidence, viewed in Chapman's favor, showed that they intentionally and gratuitously used force to cause Chapman pain.  But in 2022, it was clearly established that the gratuitous use of force to inflict pain without any justification was unconstitutional in violation of the Eighth Amendment.  *Leiser v. Kloth*, 933 F.3d 696, 703 (7th Cir. 2019) (Eighth Amendment prohibits unnecessary and wanton infliction of pain) (citing *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  And it was clear then that pretrial detainees were entitled to at least as much protection under the Fourteenth Amendment Due Process Clause as convicted criminals were under the Eighth Amendment.  *See Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 979 (7th Cir. 2013).  Thus, every reasonable jail officer would have understood in 2022 from *Leiser*, *Calhoun*, and *Gregg* that purposeful and gratuitous infliction of pain—such as punching or kicking a cooperating pretrial detainee—would also be unconstitutional.  *See Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019) (under objective reasonableness test, "an unnecessary kick, after a suspect is under control, violates the suspect's

19

clearly established rights"); *Williams v. Stauche*, 709 F. App'x 830, 836 (7th Cir. 2017) ("That guards cannot gratuitously abuse prisoners is clearly established."). The court in *Lee v. Bird*, No. 4:22-cv-53-TWP-KMB, 2024 WL 621673, at *5-*6 (S.D. Ind. Feb. 14, 2024), acknowledged only a plainly incompetent office would not have understood this in February 2022.

For these reasons, Decker, Richert, and Sellers are not entitled to qualified immunity.

E.        Injury or Causation

Finally, the defendants argue that there is no evidence that Chapman suffered any injury beyond *de minimis* that was caused by the defendants' conduct. They point to Chapman's history of seizures beginning with his 2016 gunshot wound to the head and its treatment, and continuing after the events at issue in this case. If they predated the events, they argue, they could not be caused by them. They further argue that, to the extent Chapman's seizures increased, it was due to other factors such as methamphetamine withdrawal. Finally, they suggest that Chapman himself was to blame for refusing medications prescribed for him and that his seizures stopped once he began started taking an adjusted dose of the medication. Chapman contends that, although he points to no medical evidence of causation, his testimony of injuries to his head and face as well as increased seizures and headaches after February 9, 2022, is sufficient to withstand summary judgment.

As a preliminary matter, the Court is dismayed that the defendants' brief for this section lists cases that either do not exist or do not say what the defendants say they do. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1011 (7th Cir. 2013) (cited for the proposition that "de minimis injuries do not rise to the level of a constitutional violation"; actually discussed when appellate jurisdiction exists over the denial of qualified immunity on summary judgment in Fourth Amendment case and did not address de minimis injuries at all); *Estate of Allen v. City of*

20

*Chicago*, No. 16-cv-8094, 2018 WL 4495982, at *4 (N.D. Ill. Sept. 19, 2018) (case does not exist); *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007) (cited for the proposition that since Chapman's seizures predate the use of force asserted in this case, they cannot be causally linked to the defendants' conduct; actually discussed whether the plaintiff's asthma was an objectively serious medical need and did not address causation of injury by defendant's conduct); *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008) (cited for same proposition; actually discussed whether state law claims against individual defendant were properly joined for trial with those against municipal defendant and did not address causation of injury by defendant's conduct).

Such phenomena are becoming more frequent in the age of generative artificial intelligence ("AI"), but whether these mistakes are a result of AI or other error, counsel's signature under Federal Rule of Civil Procedure 11(a) certifies that the statements in her brief are warranted by existing law; the misstatements listed above clearly are not.  The Court expects far better from defense counsel, who has regularly and ably appeared before the Court for decades. Because the misrepresentations at issue here are immaterial to the Court's decision on the issue in question, the Court declines to sanction counsel at this time.  However, it will tolerate no more such sloppiness, giving it the most generous interpretation, or deceit, giving it the worst.  Should counsel or her law firm again make such misrepresentations, they can expect to be sanctioned. They have, of course, already wasted the Court's time chasing down fictitious cases or holdings and have lost the trust of this Court.

As for the merits of the defendants' arguments, it is true that injury and causation are essential elements of a § 1983 constitutional tort.  *See Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *Whitlock v. Brueggemann,* 682 F.3d 567, 582 (7th Cir. 2012).  But even a *de minimis*

injury will support constitutional violation if the force used was excessive, although the extent of the injury is a relevant factor to consider in determining whether force was excessive.[9] *Wilkins v. Gaddy*, 559 U.S. 34, 34, 37-38 (2010) (*per curiam*) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.") (citing *Hudson v. McMillian,* 503 U.S. 1, 4 (1992)). Indeed, in *Hudson*, the plaintiff was similar to Chapman—he had been punched in the mouth, eyes, chest, and stomach without justification, and he suffered "minor bruises and swelling of his face, mouth, and lip," loosened teeth, and cracked dental hardware. *Hudson*, 503 U.S. at 4. *Wilkins* was similar—he was "punched, kicked, kneed, choked, and body slammed maliciously and sadistically and without any provocation" and suffered "a bruised heel, back pain, and other injuries requiring medical treatment." *Wilkins*, 559 U.S. at 38. In light of *Hudson* and *Wilkins*, a jury could easily find Chapman suffered injuries to his face and head that, if they were the result of excessive force, would support his constitutional tort.

As for evidence of causation by the defendants, there is little doubt that a reasonable jury could find the injuries to Chapman's face and head were caused by his interactions with the defendants in the hallway incident. As for increased seizure activity, while Chapman has no medical evidence of causation, he is competent to testify to the increasing frequency of his own seizures. And while temporal proximity alone may not be enough to establish a genuine issue of material fact on causation in other contexts like First Amendment retaliation, *see Manuel v. Nalley*, 966 F.3d 678, 681 (7th Cir. 2020), the Court believes it may be sufficient with respect to the conduct in this case. Here the defendants inflicted physical trauma on the head of a detainee

---

[9] In contrast, a *de minimis use of force* will not amount to an Eighth Amendment violation unless such force is "of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10; *see O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006).

who had preexisting brain injuries, and the increased frequency of seizures followed close on the heels of that trauma.  A reasonable jury could find a causal connection.  It is for the defendants to argue to the jury that no such connection exists and that the increase in seizures is attributable to other factors.

Because a reasonable jury could find Chapman suffered physical injuries and increased seizures as a result of the defendants' use of excessive force, the Court cannot grant summary judgment for this reason.

## V.   Conclusion

For the foregoing reasons, the Court:

- **DENIES** the defendants' motion to deem admitted the facts in their statement of material facts (Doc. 60);

- **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment (Doc. 54);

    o   The motion is **GRANTED** to the extent it seeks summary judgment in favor of:

        ▪ defendants Decker and Haring on Count 1 for excessive force within the Segregation Unit on February 9, 2022;

        ▪ defendants Dawdy and Foster on Count 2 for failure to intervene on February 9, 2022; and

        ▪ defendant Haring on Count 3 for placing Chapman in a segregation cell without obtaining medical care on February 9, 2022;

    o   The motion is **DENIED** to the extent it seeks summary judgment in favor of:

        ▪ defendants Decker and Richert on Count 1 for excessive force in the hallway on February 9, 2022; and

        ▪ defendant Sellers on Count 1 for excessive force on March 3, 2022; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

Defendants Foster, Dawdy, and Haring are **TERMINATED** as defendants.  Remaining for trial are:

23

- Count 1 against defendants Decker and Richert for excessive force in the hallway on February 9, 2022; and

- Count 1 against defendant Sellers for excessive force on March 3, 2022.

The Court will set a telephone status conference by separate order to pick dates for the Final Pretrial Conference and Trial.[10]

**IT IS SO ORDERED.**
**DATED:  July 10, 2026**

**J. PHIL GILBERT**
**DISTRICT JUDGE**

---

[10] In his response to the summary judgment motion, Chapman asks to reopen discovery to obtain additional video footage and to conduct additional depositions.  It is not proper to make such a request within a response brief; it should have been raised by separate motion explaining why such discovery could not have been conducted before the discovery deadline of September 10, 2025 (Doc. 50).